JOHN B. MCHARDY AND THE CREDITORS OF ROBERT MC-
HARDY, DEC'D., APPELLANTS, VS. THE SURVIVING EXECU-
TOR OF ROBERT MCHARDY, ET AL., APPELLEES.

The claimant of a Ganancial right under the laws existing in the Province of Florida, whilst it was part of the Spanish dominion, takes subject to the debts contracted during the marriage, which are to be paid out of the common property—he cannot take this property and leave the debts unpaid.

To recover an interest of this kind there should be a representative of the estate.

By the laws of Florida in force in 1811, '12 and 1813, the father had the usufruct of his child's property, during his minority, and was not accountable for the profits nor for the hire nor wages of his slaves.

An adverse right is not proper in a bill for distribution, and a claim so presented should be dismissed. There should be a suit at law or a bill filed or cross bill, or bill of interpleader, to attain this end.

A devise of real and personal property to pay debts, and especially certain specified debts, creates a trust which will be executed by a Court of Equity.

Nor does the presumption of payment from lapse of time apply to those debts, more especially as in this case where there has been and is property to pay debts with, and few or none have been paid and no allegation that those claimed have been paid.

Where a debt is presented under an advertisement to an executor, regularly qualified, this is sufficient, and another notice is not required to one qualified many years afterwards.

Lawyer's fees for managing a suit for distribution should be paid by an executor, like those of any other individual, on his own responsibility, so as to be presented to the Master and not to the Court for allowance in the first instance. It will then be subject of objection and of exception.

Where a will imposes a trust of this kind for the payment of debts, a Court of Equity has jurisdiction and will settle the matter of the trust upon its own rules and principles—so that a Master will be appointed to settle, adjust and audit the executor's account, and all matters, questions and subjects connected with the trust.

Appeal from a decree of the Circuit Court of the Eastern Circuit for St. John's county.

The executor of Robert McHardy, dec'd., instituted this suit in the Court below against the creditors and devisees of said Robert McHardy and others, asking advice as to the administration of said estate, the disposition of a sum of money on hand, the payment of debts, the distribution amongst those entitled and a final discharge.

The executor alleges the collection of ten thousand dollars, obtained from the Government of the United States, for injuries and losses sustained by Robert McHardy in his planting interests by the invasion of the Province of

East Florida, then under the dominion of Spain, in the years 1811, 1812 and 1813. A claim to this fund is set up by two parties, children of Robert McHardy by different mothers, and by the creditors.

The answer of John B. McHardy, one of the children of Robert McHardy, dec'd., sets up the following facts upon which his claim is based, viz: "During the years 1811, 1812 and 1813, when the said losses accrued, his father Robert McHardy was a Spanish subject; that prior to that time, to-wit, in the year 1798, he had intermarried with Mrs. Mary McHardy, a resident of Nassau, New Providence; that prior to said marriage, a marriage settlement or contract was made by said McHardy, by which the property was settled upon her as her separate property, or that subsequently her father, John Bunch, settled the negroes with which the said crops were made, upon said Mary as her separate property; that some time after 1802 they removed to the Territory of Florida, bringing the negroes. with which the crops were made, and that Mrs. McHardy died, leaving said John B. McHardy as her sole heir-at-law. And he further saith, that after the death of Mrs. McHardy, the said Robert McHardy kept possession of the joint property, the increase during coverture, and also the separate property of Mrs. McHardy, and worked them at the domicil at Tomoka till after the year 1813, and made no division and gave no account of such joint property and of the increase and proceeds thereof till after the year 1813, and that this defendant, as heir-at-law of said Mary McHardy, is entitled to a large part of the proceeds paid the said complainant for the loss of said crops, being the increase and proceeds of the labor of the negroes belonging to the defendant in right and by descent from his mother, the said Mary, and that he is entitled to at least one-half of the proceeds of said crops in right of his mother, being the proceeds of the property acquired during cover-

ture and with which the said Robert McHardy, after the death of said Mrs. Mary McHardy, had been doing business and planting; that from the removal from Nassau to East Florida, till after the year 1813, they were residents of a Province of Spain and were wholly subject to its laws, and that at the time of the death of Mrs. Mary McHardy, her property descended to the defendant under Spanish law, by which he became entitled to the Ganancial property acquired during the coverture, and he prays his portion of the amount paid complainant for loss of crops may be set off and decreed to be paid by said complainant.

Mrs. Mary McHardy, it appears, died in 1807, after her removal to Florida. John B. McHardy, at the time these losses were sustained, was a minor of about twelve or thirteen years of age.

The increase of the negroes settled on Mrs. McHardy, from nine to twenty-five, were sold to G. Anderson in 1823.

Robert McHardy, some time after the death of his first wife, and in the latter part of the year 1813 or 1815, intermarried with Caroline McHardy, his second wife, whose children claim, on similar grounds, a portion of the money in the hands of the executor. The negro property belonging to Mrs. Caroline McHardy was not brought to Florida until the year 1815.

On the first day of December, 1822, Robert McHardy executed a deed of assignment whereby he assigned to John Rodman, of St. Augustine, all his property, real and personal, "in trust for payment of all his debts, with power to sell lands, goods, &c., and from the proceeds to pay what sum of money he may owe to Mrs. Fontane for board and lodging, next a debt due John Rodman and John Drysdale, next whatever sum he may owe Samuel Fairbanks, and the firm of Ripley & Fairbanks of St. Augustine, and afterwards to pay all his just debts contracted in Flor-

da, and afterwards whatever may be owing by him as one of the firm of James and Robert McHardy, in Nassau, New Providence," and providing for the support of the assignor and his family.

On the same first day of December, 1822, the said Robert McHardy made his last will and testament, which was admitted to probate fourteen days after, whereby he directed his " executors, or a majority of them, or the survivor, to sell and dispose of his goods and chattels, lands, &c., and all other estate, real and personal, and to pay his just debts," &c. In the fourth article he expressly declares " his last will and testament to be subject to a deed of assignment of his whole estate, real and personal, made and executed by me this day to John Rodman, one of my executors herein named, in trust for the purposes mentioned in said deed of assignment, hereby ratifying and confirming said deed of assignment in all its parts."

A few days after the execution of his will Robert McHardy died, and immediately after, Rodman, Orman and Sibley qualified as his executors. The present executor, who is the survivor of those named in the will, qualified in the year 1838.

It appears that Edward Sherman, now deceased, whose claim is not embraced by the provisions of the will and deed of assignment executed by Robert McHardy in his life time, recovered a judgment against the executors of McHardy who first qualified, at May term, 1824, and also another judgment against John Rodman, one of said executors, in the year 1842. This claim is now represented by Whipple Aldrich, administrator, &c., of the estate of said Sherman.

Objection to the claims of the creditors was made on the ground that they were not presented to the complainant surviving executor as required by an advertisement, in con-

formity to the statute, made by him after he had qualified, and also that they are barred by lapse of time.

The Court below decreed in favor of the children of Caroline McHardy, rejecting the claims of John B. McHardy and of the creditors.

*G. W. Call* and *G. R. Fairbanks* for Appellants.

*Benj. A. Putnam* for Appellees.

BALTZELL, C. J., delivered the opinion of the Court.

This is a suit instituted by the surviving executor of Robert McHardy, who died in the city of St. Augustine in the year 1822, against the creditors, devisees of the estate, and others, asking advice as to the administration and disposition of a sum of money on hand—to have the debts paid—a distribution amongst those entitled, and *for* a discharge.

The principal question is presented by the claim of two parties, children of the testator by different mothers, to a portion of ten thousand dollars obtained from the Government of the United States for injuries to and losses sustained by him in his planting interests by the invasion of the Province of East Florida, then under the dominion of Spain, in the years 1811, 1812 and 1813.

The claim of one of these, John B. McHardy, will be best understood by the statement contained in the answer filed by him. "During the years 1811, 1812, 1813, when the said losses accrued, his father, Robert McHardy, was a Spanish subject; that prior to that time, to-wit: in the year 1798, he had intermarried with Mrs. Mary McHardy, a resident of Nassau, New Providence; that prior to said marriage, a marriage settlement or contract was made by said McHardy, by which the property was settled upon her as her separate property, or that subsequently her father, John Bunch, settled the negroes with which the said

crops were made upon said Mary as her separate proper-
tp ; that sometime after 1802 they remov,ed to the Territo-
ry of Florida, bringing the negroes with which the crops
were made, and that Mrs. McHardy died, leaving the said
John McHardy as her sole heir-at-law." And he further
saith, that " after the death of Mrs. McHardy, the said
Robert McHardy *kept possession of the joint property*,
the increase during coverture, and also the separate prop-
erty of Mrs. McHardy, and worked them at the domicil at
Tomoka till after the year 1813, and made no division and
gave no account of such joint stock property, and gave
no account of the increase and proceeds thereof till
after the year 1813, and that this defendant, as heir-at-
law of said Mary McHardy, is entitled *to a large part of
the proceeds* paid the said complainant for the loss of said
crops, being the increase and *proceeds of the labor of the
negroes belonging to the defendant*, in right and by descent
from his mother, the said Mary, and that *he is entitled to
at least one-half* of the proceeds of said crops *in right of
his mother*, being the proceeds of the property acquired
during coverture and with which the said Robert McHardy,
after the death of said Mrs. Mary McHardy, had been do-
ing business and planting ; that from the removal from
Nassau to East Florida till after the year 1813, they were
residents of a Province of Spain, and were wholly subject to
its laws, and that at the time of the death of Mrs. Mary Mc-
Hardy, her property descended to defendant under Span-
ish law, by which he became entitled to the Ganancial
property acquired during the coverture, and he prays his
portion of the amount paid said complainant for loss of
crops may be set off and decreed to be paid by said com-
plainant."

A right is first asserted to a *large part of the proceeds*
paid for losses, being the increase and proceeds of the labor
of the negroes *belonging to defendant in right and by de-*

scent from his mother ; and secondly, to half of the crops in right of his mother, being the proceeds of the property acquired during the coverture. Mrs. McHardy was married in 1798, came to Florida in 1802, and died in 1807, so that half the wages or hire of her slaves from 1802 to 1807, together with their labor in 1811, '12 and '13, constitutes the extent of this claim. Is he entitled to all this or to either sum ? If there is a just claim due the estate of Mrs. Mary McHardy against any one, derived even under Spanish laws, it must be asserted in the mode prescribed by our laws, and letters testamentary or of administration are indispensable to its maintenance. The Courts, neither of law nor of equity, recognize a claim presented in any other shape, and very appropriately, as the primary duty of the legal representative, whether executor or administrator, is to pay debts, an obligation enforced by his oath, and in case of the latter by his bond. These paid and discharged, the right of the distributee, legatee or heir commences.— The Spanish law recognizes as to a Ganancial interest an obligation of this very character, when it declares that "gains and losses being common, the debts which are contracted during the marriage, are to be paid out of the common property." 1 White's Recop., 63.

So that if this claim were now sustained, an enquiry would be necessary to ascertain as well the losses as the gains during this period. This has not been suggested and with some prudence, as the record shows but very few gains and a large indebtedness, the increase of the negroes settled upon Mrs. McHardy, from nine to twenty-five, sold to Anderson in 1823, constituting perhaps the only evidence of gains, if they are to be regarded as a part of the joint property.

A claim asking all of the common property, the gains and profits to the exclusion of the losses and in disregard of the joint responsibilty of a joint concern, asserted

against those having a fair right to be remunerated out of it, is not entitled to the favorable regard and consideration of a Court of Equity. It is but justice to the counsel of this party to say that he did not insist upon the claim in this aspect.

The main reliance however is upon the other position, that J. B. McHardy "is entitled to a large part of the proceeds, being the increase of the labor of the negroes belonging to him in right and by descent from his mother."

At the time of these losses in 1811, '12 and '13, J. B. McHardy was a minor, probably of the age of twelve or thirteen years, so that his rights in the money claimed will depend on the character of his interest in the property under the Spanish laws then in force in the province of Florida. Was a child there entitled to the possession of property during his minority—to its fruits—to the wages of his slaves, or could he at the expiration of his minority hold his father, if in possession, accountable for the profits? This is the question. No law has been cited in support of any such proposition; on the contrary, in the very able brief furnished by the counsel of the creditors, the opposite doctrine is maintained and demonstrated. "Fathers are bound (we quote but one authority from it,) to administer, to take care of and defend, as well judicially as otherwise, the adventitious property of their children, enjoying the usufruct of it and the dominion of their profectitious property, although the peculium or stock, that is the property which the sons acquire in the army or in the service of the King at Court, belongs in entire dominion to them." 1 White's Recop., 66.

The law of Spain then giving to the father the dominion over the slaves and their wages, there is no just claim on the part of his son, J. B. McHardy, against his estate on this account.

It is said, however, that the labor of these slaves follows

and must abide the original trust created in Nassau. That the provisions of the trust deed would control and determine the interest of the female in any country to which the property might be taken, as a general proposition, is true and may not be controverted. May this be affirmed of the person who is to take in remainder? Unless some condition or restriction is attached to the ownership, there is no reason for holding such a consequence. There is no restriction attached to this interest. John B. McHardy, if of full age, would have taken the property in absolute right, truly stated in his answer, "as *belonging to him in right of his descent from his mother.*" But he was under age and could not take the full ownership. This, very obviously, was owing, not to the deed, but to the law prohibiting the enjoyment of the property during his minority, and giving the use of it to his father as a means of support to his child.

In every view we have been able to take of the case, the claim of John B. McHardy to these gains, to the wages and labor of these slaves, is not sustainable in law or equity, in conscience or right, and the Court below did right in rejecting it. In this respect the decree of the Court below will be affirmed.

The reasons already stated, for the most part, are fatal to the claim of the children of Caroline McHardy, second wife of the testator, to whom a decree is rendered for $3483.41. For other reasons it should be rejected. A claim is scarcely asserted by these parties, either in the answer or in the argument of their counsel, and very properly, for there is no testimony in the record to support it. The proof is, that their mother was not married until the latter part of the year 1813 or 1815, and that her negroes were not taken to Florida until 1815. The decree of the Circuit Judge in their favor will be reversed and set aside·

The important interests thus disposed of are raised in the

answer in reply to a suggestion of the bill. On this ground alone the claim should have been dismissed. Adversary rights, adverse claims are not permitted, are indeed in direct conflict with a bill for account, distribution and discharge by an executor, which can only be after these have been disposed of, and ¡nothing remains but to pass the account and distribute the proceeds. These hostile claims appropriately require a different mode of proceeding by bill or cross bill, or of interpleader, if they do not rightfully pertain to another jurisdiction. If we have not pursued this course of dismissal here, it has been from a disposition to determine the case upon its merits, if it may be done, rather than turn the parties to a new suit, more especially when the point has been argued and discussed without relying on so manifest an objection.

The mode of presenting claims for adjudication is founded in a high degree of wisdom, connected with the right and proper disposition of the subject, and should be adhered to by the Courts. There is propriety as well as safety in not deserting *antiguas vias*, and a departure is ever attended with perplexity to the Court in the decision of the case, and to the parties in the ascertainment of their rights.

The claims of the creditors are the next subject of consideration. To determine these it is necessary to refer to two instruments of writing executed by the testator, McHardy, a few days before his death: the one an assignment or deed of trust, the other his last will and testament.

On the first of December, 1822, Robert McHardy assigned and transferred to John Rodman, of St. Augustine, all his property, real and personal, " in trust for payment of all his debts, with power to sell lands, goods, etc., and from the proceeds to pay what sum of money he may owe to Mrs. Fontane for board and lodging, next a debt due John Rodman and John Drysdale, next whatever sum he

may owe Samuel Fairbanks and the firm of Ripley & Fairbanks, of St. Augustine, and afterwards to pay all his just debts contracted in Florida, and afterwards whatever may be owing by him as one of the firm of James & Robert McHardy, in Nassau, New Providence."

On the same 1st of December, 1822, he made his last will and testament, admitted to probate fourteen days after, whereby he directed "his executors, or a majority of them, or the survivor, to sell and dispose of his goods and chattels, lands, etc., and all other estate, real and personal, and to pay his just debts," etc.

In the fourth article he expressly declares his "last will and testament to be subject to a deed of assignment of his whole estate, real and personal, made and executed by me this day to John Rodman, one of my executors herein named, in trust for the purposes mentioned in said deed of assignment, hereby ratifying and confirming said deed of assignment in all its parts."

Although the assignment might be objectionable, about which it is not necessary to express an opinion, this interpolation of its leading provision in the will adopts it and makes it a part of it, as if it were fully and entirely written out in the will. "If a testator in his will refers expressly to any paper already written and has so described it that there can be no doubt of the identity, that paper, whether executed or not, makes part of the will, and such reference is the same as if he had incorporated it." Habergham vs. Vincent, 2 Vesey, 228.

"In reference to wills the rule is, that the invalidity of any trust created by the will does not destroy trusts and interests otherwise valid." 5 Paige, 318.

The feature objected to in the assignment, that of providing for support of the testator and his family, is not continued in the will, and even if extended there would, according to the authority cited, not have affected the other

provisions. There is then a good and valid direction in the will to the executors to pay certain specified debts, then other debts contracted in the country in which he resided, and thirdly a specified debt due in Nassau. The executors, in undertaking their office, assumed upon their oaths "to perform the last will and testament of their testator," and "to perform every part of the will." Duval, 170; Thompson, 197; LeBaron vs. Fauntleroy, 2 Florida, 299; Will. on Ex., 1104.

That the debts specified and embraced by the provisions of the will are not to be presumed to be paid through the lapse of time, we think very clear. Such a presumption has not an application even remote to a case like the present, where there are large and numerous debts, considerable property yet to be disposed of, and very few, scarcely any of the debts satisfied, and these latter bearing no proportion to the amount yet due and unpaid. The bill, so far from alleging payment of the debts, admits their existence. That they have not been paid is from no fault of the creditors. The present executor, who qualified as late as 1838, sixteen years after the death of the testator, has been the only one to accomplish any thing in the administration, as through his exertions the $10,000 have been recovered. The record is almost a blank as to the payment of debts, being filled with judgments recovered by creditors, and revived and renewed again and again, from time to time. Indeed, with the exception alluded to, the administration of the estate remains now, after the lapse of near forty years, to be commenced. Very clearly, and obviously as far as the creditors are concerned, there has been a breach of trust and a disregard of the injunctions of the will in their behalf. Is this action to be permitted to operate to their prejudice ? Are their rights to be injured by this inattention, neglect and failure of duty ? We think not. The property of the estate belongs either to the cred-

40

itors, the legatees and devisees, or to the executors. If presumption of payment operates, it avails alike against the legatees and devisees, so that the effect of its allowance against the creditors would be to turn the entire remaining estate to executors whose only claim would be their failure and neglect of duty. A wise and salutary rule intended for the protection of rights and interests, cannot be allowed to be converted into an instrument of mischief, and be made to operate as a temptation to their defeat and destruction. Not such is the law in letter or in spirit, but the very reverse and opposite in all its phases and aspects, as declared by all the Courts.

"The creditors, in whose favor a charge on the realty is made, acquire, as before the alteration of the law, the character of *cestui que trusts*, and in equity they will not be allowed to lose their debts because they do not go to law to enforce payment when they have a trustee to pay them." Turner & Russ., 309; Bailey vs. Akin, 7 Vesey, 319; Shaw vs. Bower, 1 Kean, 576; Williams Per. Prop., 320.

"The trustee's neglect shall not prejudice the creditor." 6 John. Chy., 294 and '5; Rogers vs. Rogers, 3 Wend., 518.

"They have been guilty of a breach of trust, and the statute does not apply." 4 Price, 103, 109.

The effect of a provision of this kind as to schedule debts is, that a purchaser will not be protected against them. "When the trust is for payment of the debts generally, the purchaser is not bound to see to the application of the [purchase money, although he has notice of the debts. For a purchaser cannot be expected to see to the observance of a trust so unlimited and undefined. But if the trust be of such a nature that the purchaser can reasonably be expected to see to the application of the purchase money, as if it be for the payment of legacies, which are scheduled and specified, he is bound to see that the money is applied accordingly." 10 Barr's Rep., 267. So

as to sales to pay debts.    Notes to Will. on Per. Property, p. 223 ; 3 Mason, 218; 6 Vesey, 654.

Delay in winding up an estate may be urged to repel presumption.    2 Har. & M., 145, 154;   2 Phil. Ev. Cow. & Hill, 326—note 307.

The reason of this rule of presumption is perhaps best explained by the remarks of the English Chancellors : " There are cases where great length of time operates not as a bar but as raising a presumption that a debt has been paid or a right released.    Neither of them applies to that of *cestui que trust* and trustee.    It does not, however, follow that relief will be granted after great lapse of time, it being the constant course of courts of equity to discourage stale demands, &c.    When there has been a long period during which a party has, under an innocent mistake, misapplied a fund from the laches and neglect of others, and the accounts have become entangled, the Court, under its general discretion, considering the enormous expenses of enquiry, the great hardship of calling upon representatives to refund what families have spent, acting on the notion of its being their property, while giving relief, has been in the habit of fixing a period to the account."    Although the account was of very long standing, two hundred years, they gave a decree and said, can the Court give to parties money they acknowledged not to be theirs ?    1 Jacob, 443.

" It is true that courts of equity do discourage suits for old stale accounts, and very rightly ; but every case of that kind must be considered on its own circumstances, and ought to be determined by the justice and equity of that particular case arising from those circumstances.    It is clear that no presumption of satisfaction arises from this length of time, that is to the plaintiffs, for it is not pretended that anything was paid to them or that their right was in proper time fully disclosed to them."    Pomfret vs. Windsor, 2 Vesey, Sen., 483.

"When a testator charges his real estate with the payment of debts, a trust is created in favor of creditors, who are entitled to priority over other devisees." Mill. Eq. Juris., 486.

By the very terms of this will the creditors are preferred to these.

Is there merit in the other objection taken, that the debts were not presented to the complainant as required by an advertisement made by him after he had qualified? There is no allegation that they were not presented to the other executors, who had qualified immediately after the death of McHardy in 1823. In fact they seem to have been so presented. Under such a state of case, we are clearly of opinion that a farther presentation was not required. The general rule is that notice to one executor is notice to all. 1 Salk., 313 ; 2 Ld. Ray., 871 ; 2 Bibb, 330.

The law evidently contemplates but one notice, and one presentation of a claim to the rightful representative.

The creditors then mentioned in and whose cases are embraced by the deed of assignment and will executed by Robert McHardy, will be paid out of the assets and realty in the manner and order in which they are there directed to be paid.

The claim of Edward Sherman, now represented by Whipple Aldrich, his administrator, is perhaps the only one not embraced by the provisions of the will and assignment. Is this demand subject to the objections stated, or to any other statutory bar? There was a judgment in favor of Sherman at May term, 1824, two years after McHardy's death, and another judgment in 1842, the first against Rodman, Orman and Sibley, the last against Rodman, and these effectually dispose of the objections made. A judgment against one executor is good against the estate, and the judgment effectually disposes of the objection for want of presentation, and there is no other bar.

For the reasons already stated, the doctrine of presumption is wholly inapplicable to the case, as to any and all credit-oss not barred at the time of the testator's death. If their debts were presented to the executors in proper time, they may be established by proper proof.

The decree of the Circuit Court will then be reversed and set aside, so far as it allows the claim of the heirs of Caroline McHardy and so far as it rejects the claims of the creditors enumerated and stated and embraced by the will, and the claim of Sherman, and in all respects as far as it conflicts with the views of the Court as here expressed as to the creditors to be paid and to the mode and order of their payment, and the cause will be remanded to that Court with directions to proceed to the execution of the trusts of the said assignment and will—that no part of the injunctions of the latter may be disregarded or evaded—to have the debts paid—taking an account by the trustee, and winding up the estate; and the Court will appoint a Master to adjust the accounts, so far as said trust is concerned, the said matter of said trust being exclusively within the jurisdiction of the Court of Equity, and said account to be settled upon the rules and principles prevailing in Courts of Chancery. 2 Story's Eq., 319; 1 Story, 556, 509.

The claim for compensation to solicitors, after being paid by the executor on his own responsibility, like that of any other individual, will be passed upon by the Master, and after being approved or rejected by him, his decision will be subject to revision by the Court. An allowance by the Court, such as is made in this case, of $1000 for services in this suit, is not approved, as it disposes of a large amount of the fund in a summary manner, without notice and without a hearing, and without any lien whatever upon the fund. If a sum be paid by the executor to his counsel for services, it will form ground of charge in his account on final settle-

ment.   The costs of this Court to be settled out of the fund and paid by the executor.