DEPARTMENT OF AGRICULTURE, LABOR AND INDUS-
TRY OF THE STATE OF MONTANA, Appellant, *v.*
DeVORE, Sheriff, Respondent.

(No. 6,814.)

(Submitted October 9, 1931.   Decided November 21, 1931.)

[6 Pac. (2d) 125.]

48

Mr. L. R. Foot, Attorney General, Mr. T. H. MacDonald, Assistant Attorney General, and Mr. I. W. Choate, for Appellant, submitted a brief; Mr. MacDonald argued the cause orally.

Mr. W. S. Hartman and Mr. Walter Aitken, for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an action in conversion. Defendant's general and special demurrer to the complaint was sustained. Plaintiff elected to stand on the complaint and judgment for defendant was entered. The appeal brings up for determination the sufficiency of the complaint to withstand the attacks made upon it.

The complaint alleges, in substance, that the Department of Agriculture through the division of grain standards on the fourth day of December, 1929, with the consent and by the express authorization of the Walsh Grain Company, a copartnership, intervened in the affairs of that company and took possession of certain described personal property belonging to it, of the value of $2,281.87 (none of which was stored grain against which storage tickets had been issued), for the purpose of paying a part of the claims of the holders of warehouse receipts for grain stored with it, which warehouse receipts the Walsh Grain Company was unable to redeem; that the taking possession by the Department of Agriculture was needful for the protection of the interests of holders of warehouse receipts and other evidences of the delivery of grain to the Walsh Grain Company, for which payment had not been made; that there were warehouse receipts then outstanding

amounting to $16,920, which were in excess of the assets of the Grain Company, and of bonds applicable to the payment of claims for stored grain; that on the sixth day of December, 1929, while the property was in the possession of the Department of Agriculture, defendant, as sheriff of Gallatin county, wrongfully levied upon and seized the property and converted it to his own use and thereafter sold it without the permission or consent of the department, to the damage of plaintiff in the sum of $2,281.87, for which it asks judgment. The complaint alleges that plaintiff, on and after December 4, 1929, was the owner of, and had a special property interest and ownership in, the described property and was entitled to the immediate possession thereof.

As above stated, the demurrer was both general and special. The special grounds need not be considered, for the general demurrer reaches the question involved.

In determining the sufficiency of the complaint we are required to interpret Chapter 42, Laws of 1925, which provides: ''Whenever any warehouseman, grain dealer, track buyer, broker, agent or commission man is found to be in a position where he cannot, or where there is a probability that he will not meet in full all storage obligations or other obligations resulting from the delivery of grain, it shall be the duty of the Department of Agriculture, through the Division of Grain Standards, to intervene in the interests of the holders of warehouse receipts or other evidences of delivery of grain for which payment has not been made, and the Department of Agriculture shall have authority to do any and all things lawful and needful for the protection of the interests of the holders of warehouse receipts or other evidences of the delivery of grain for which payment has not been made, and when examination by the Department of Agriculture shall disclose that for any reason it is impossible for any warehouseman, grain dealer, track buyer, broker, agent or commission man to settle in full for all outstanding warehouse receipts or other evidences of delivery of grain for which payment has not been made, without having recourse upon the bond filed by said

warehouseman, grain dealer, track buyer, broker, agent or commission man, it shall then be the duty of the Department of Agriculture for the use and benefit of holders of such unpaid warehouse receipts or other evidences of the delivery of grain for which payment has not been made, to demand payment of its undertaking by the surety upon the bond in such amount as may be necessary for full settlement of warehouse receipts or other evidences of delivery of grain for which payment has not been made.''

The question is: Were the acts which the Department of Agriculture did, as alleged in the complaint, ''lawful and needful for the protection of the interests of the holders of warehouse receipts?''

In order to ascertain the legislative intent in passing Chapter 42, it is helpful to make reference to other statutory provisions regulating public warehousemen.

Whenever grain is delivered to a warehouseman for storage the transaction constitutes a bailment and not a sale, and ''such grain shall at all times in the event of failure or insolvency of such bailee be first applied exclusively to the redemption of outstanding storage warehouse receipts for grain so stored with such bailee, and in such event grain on hand in any particular warehouse or elevator shall first be applied to the redemption and satisfaction of receipts issued by such warehouse.'' (Sec. 4, Chap. 41, Laws of 1923.)

Warehousemen are required to ''give a bond with good and sufficient sureties to be approved by the commissioner of agriculture to the state of Montana, in such sum as the commissioner may require, conditioned upon the faithful performance of the acts and duties enjoined upon them by law.'' (Sec. 5, Chap. 41, Laws of 1923.) And no warehouseman shall sell or dispose of or deliver out of store except to the owner any stored grain except upon notice, in advance, to the Department of Agriculture and after complying in full with the laws of the state and the regulations of the Department of Agriculture relating to the handling of stored grain. (Sec. 4, Chap. 41, Laws of 1923.)

Chapter 42 is an amendment of section 6 of Chapter 41, Laws of 1923. The amendment made by Chapter 42 did not change the original purpose of that section. It was evidently designed originally to authorize the department, in the event of the existence of the conditions named therein, to take proper steps to see that the proceeds from the sale of all grain held for storage be first applied exclusively to the redemption of outstanding storage warehouse receipts for grain stored, as commanded by section 4 of the same Act. The amendments made by Chapter 42 simply extended the right of the department to intervene, not only for the protection of the interests of holders of warehouse receipts, but also for the protection of the interests of those holding evidences of the delivery of grain for which payment had not been made. That the right of the department merely goes to the enforcement of section 4, either under the original Act or under the amendment, is apparent. After applying the proceeds of the stored grain to the redemption and satisfaction of warehouse receipts, if there still remains unpaid any balance due on storage tickets or evidences of delivery of grain for which payment has not been made, then the department is obligated to resort to the bond filed by the warehouseman.

The legislature did not attempt to give to the Department of Agriculture any more authority than to do whatever was needful and lawful to have the proceeds of the stored grain applied to the redemption of storage tickets and then to demand payment of the bond. That this is so is manifest from Chapter 42, Laws of 1925, wherein the department is authorized to require the surety to pay ''such amount as may be necessary for full settlement of warehouse receipts or other evidences of delivery of grain for which payment has not been made.'' The legislature never contemplated that there should arise a situation, as here, where the liability of the warehouseman to ticket holders shall exceed the amount of stored grain on hand and the liability of the surety on the bond. That being so, how can it be said that the statute confers authority on the department to go further?

If, after applying the stored grain to the payment of the claims of those entitled thereto under section 4 of Chapter 41, and after resorting to the bond given for their protection, there still remains an unpaid balance due to the ticket holders and those holding evidences of unpaid claims for grain delivered, they stand as to the balance due on an equal footing with other creditors of the warehouseman.

But the plaintiff contends that, since the warehouseman ■■■■■ consented that the department take possession of the property, the transaction amounts to a voluntary transfer of the property to plaintiff as agent for the ticket holders, and simply amounts to a preference to these creditors which must stand, in the absence of proceedings in bankruptcy to set aside the transfer. If the transaction can be thus viewed the contention is sound. A debtor may prefer one creditor to another, or may give security to one in preference to another. (Sec. 8601, Rev. Codes 1921.) The general rule is stated in 27 C. J. 618, as follows: "The right of the creditor to accept a conveyance of property from his debtor in payment of his debt follows as a necessary consequence from the right of the debtor to make such conveyance. Unless restrained by statute a creditor may in good faith take property of his debtor in payment of a bona fide debt, and it is not evidence of bad faith on his part or a circumstance which will taint the transaction with fraud that nothing is left out of which other creditors may satisfy their claims. Similarly a creditor may accept security for his claim, and in the absence of statute his right to do so is not affected by the debtor's insolvency or his knowledge of it, or the fact that by securing himself he defeats another. If the creditor obtains only what is due him, there cannot be said to be fraud in the transaction. One creditor of a failing debtor is not bound to take care of another, or to abate any degree of vigilance in looking after his own rights in order to give some other creditor a chance equal or superior to his own. He may even use influence to induce his debtor to give a preference."

This rule applies in this state to an insolvent debtor. (*Hale* v. *Belgrade Co.*, 75 Mont. 99, 242 Pac. 425.) And such a transaction is expressly excluded by statute from the operation of the statutory provisions relating to assignments for the benefit of creditors. (Sec. 8614, Rev. Codes 1921; and see *Heath* v. *Wilson*, 139 Cal. 362, 73 Pac. 182.) And the preference may be made by conveyance of real or personal property, either directly to a creditor in satisfaction of his claim, or to a third person for the creditor's benefit (27 C. J. 620, and cases there cited), and when this is done the property is not subject to attachment against the grantor. (*Greer* v. *Traders Bank of Canada*, 132 Mich. 215, 93 N. W. 437.)

The difficulty here is to determine whether the transaction pleaded amounts to a transfer of the property. The allegation here is that the department, with the consent and by the express authorization of the Grain Company, intervened and for the purpose of paying a part of the claims of the ticket holders the Grain Company delivered into the possession of the department, and it took actual possession of, the property in question.

If the transaction can be upheld as giving the preferred creditors any rights, it must be on the theory that the transaction operated as a transfer of the title to the property to the department, in trust for the ticket holders. "If a preference is otherwise unobjectionable the particular form of the transaction by which it is made appears to be immaterial so far as the rights of other creditors are concerned, except where some positive statutory prohibition intervenes." (27 C. J. 619.)

A transfer is an act of the parties, or of the law, by which the title to property is conveyed from one living person to another (sec. 6835, Rev. Codes 1921), and where not expressly required by statute to be in writing, it may be made orally. (Sec. 6841, Id.) But where there is a writing and it is delivered to a third person for the benefit of the grantee, his assent must either be shown or presumed. (Sec. 6848, subd. 2, Id.) Where the transfer is accomplished orally, as here, it is equally apparent that assent on the part of the

grantee must be shown. And the lien of a judgment procured by another creditor cannot be displaced by a presumed assent of the party invoking the presumption who knew nothing of the transaction until after the lien had attached. (*Hibberd* v. *Smith,* 67 Cal. 547, 56 Am. Rep. 726, 4 Pac. 473, 8 Pac. 46.) The department cannot act as agent for the ticket holders to accept a transfer of property for them unless they so agree, the statute not making the department their agent for such purpose.

If the department possesses such authority in any case it must be by virtue of an agreement with the ticket holders. There is no allegation in the complaint that the ticket holders, or any of them, consented that the department act as agent for them, or any of them, to accept a transfer of property from the debtor. The complaint does not proceed upon that theory but rather upon the theory that the department did what it conceived to be its duty under the statute.

From aught that appears from the complaint it may have been a ticket holder who obtained the writ under which the sheriff acted in making the levy and sale of the property involved. As above noted, the department had the right under the statute to intervene and take possession of stored grain and see that the proceeds thereof were properly applied, and this the ticket holders would be deemed to have assented to; but as to any other property or assets of the warehouseman a ticket holder might be unwilling to have the department act as agent for him. It cannot be said that he will be deemed to consent to the act because it purports to be for his benefit. Such acts may not be for his benefit. This is not a case where the transfer is for the benefit of one creditor. It is for the benefit of a certain group of creditors. There may be conflicting interests among the ticket holders themselves. One ticket holder might prefer to proceed independently of the rest, and seek to establish his claim as one having priority over those of others by reason of, let us ·say, superior diligence in prosecuting his claim in court and obtaining a lien superior to those of others. The department has no author-

ity, independently of their consent, to act for all of them, other than to take charge of stored grain and see that it is applied exclusively to the redemption of warehouse receipts and to demand payment on the bond filed for their benefit. The consent of the creditors after the transfer or assignment adds nothing to its legal operation (5 C. J. 1068, note 62), and the property attempted to be assigned or transferred for the benefit of a group of creditors, whose assent is not shown, is subject to seizure on legal process. (5 C. J. 1068, note 66.)

The suggestion has been made that the ticket holders are not ▮ creditors of the warehouseman, but bailors. That this is their status to the warehouseman is true, but when the department is authorized to, and does, intervene, they are treated as creditors holding liquidated claims. Were this not so, how could the department require the sureties on the bond to pay such an amount as will be necessary for the full settlement of the claims of those entitled to resort to the bond, as commanded by Chapter 42?

It has also been suggested that the transaction pleaded ▮ amounts to a trust declared by the warehouseman as trustor, to the department as trustee and for the benefit of the ticket holders. Conceding, without deciding, that this could have been done, the complaint does not allege that it was done. The requisites of a voluntary trust are that it must with reasonable certainty indicate (1) an intention on the part of the trustor to create a trust, and (2) the subject, purpose and beneficiary of the trust. (Secs. 7884, 7885, Rev. Codes 1921.)

There is nothing in the complaint to indicate an intention on the part of the warehouseman to create a trust. Neither does the complaint show that the trustor, if we assume the warehouseman was such, indicated with reasonable certainty, or at all, who were the beneficiaries of the trust. He might have desired to prefer one ticket holder to another. The fact is that the most that can be determined from the complaint, is that the department took possession of the property for the purpose of paying part of the claims of ticket holders, and that

it did so with the consent and express authorization of the warehouseman. The complaint is not susceptible of any other interpretation than that the department, and not the warehouseman, was to determine to whom the proceeds of the property should be paid and how much to each one. It cannot be held that the complaint is sufficient to establish a voluntary trust.

The court properly sustained the demurrer to the complaint. The judgment is affirmed.

Mr. Justice Galen concurring.

MR. CHIEF JUSTICE CALLAWAY: I concur. Within the limitations prescribed by statute there is imposed upon the Department of Agriculture the duty of intervening for the protection of the holders of warehouse receipts, or other evidences of delivery of grain for which payment has not been made. The bone of contention is the extent of those limitations. It seems as plain as day to me that the statutes, section 4 of Chapter 41, Laws of 1923, and section 6 of that chapter as amended by section 1 of Chapter 42, Laws of 1925, give the department the authority to do all things lawful and needful in the following particulars: To take possession of the stored grain in behalf of those holding warehouse receipts, or storage tickets, and to apply the grain exclusively to the redemption and satisfaction of the receipts, or tickets, and if the stored grain be not sufficient, to take the steps necessary to obtain satisfaction from the surety upon the bond.

It seems to me that to say the department is granted any further authority to establish a preferential right for the ticket holders is to legislate. To say that the department has the right to grab coal, hay, alfalfa seed, bone meal and the like, not paid for, to the exclusion of bona fide creditors upon the assumption that the phrase "to do all things lawful and needful" permits the department to do so, is going further than I can go.

I am unable to see that any trust relationship exists upon the facts pleaded. If it exists in this case it would exist in any case where the officer representing the department said to the warehouseman, "You are in a failing condition and I am taking possession of everything you possess to pay the ticket holders," followed by the oral consent, or even silent acquiescence, of the warehouseman.

If the legislature had intended to give the holders of warehouse receipts, or storage tickets, any further preferences than those expressed in the statute that body could, and doubtless would, have said so. It did not, and we may not.

MR. JUSTICE MATTHEWS: I dissent. In my opinion the court has fallen into error by failing to give a sufficiently broad scope to our statutes regulating the business of warehousemen; in determining the powers of the department of agriculture under the law of agency; and in treating the holders of storage tickets as creditors of the insolvent warehouseman.

Under the common law, grain dumped in storage lost its identity and title passed to the warehouseman, but this is not so under statutes such as ours, declaring the transaction a bailment and not a sale. Here the holders of storage tickets and all bailors who have placed their grain in storage are tenants in common of the contents of the warehouse, up to the full amount of this "fungible" commodity, for which evidences of storage have been issued, and regardless of whether or not any of the grain on hand was delivered for storage. Title does not pass to the warehouseman, or, through him, to innocent parties to whom he has purported to sell it. (*Stutsman* v. *Cook*, 53 N. D. 162, 204 N. W. 976; *Hall* v. *Pillsbury*, 43 Minn. 33, 19 Am. St. Rep. 209, 7 L. R. A. 529, 44 N. W. 673; *Young* v. *Miles*, 20 Wis. 615; *Tobin* v. *Portland Mills*, 41 Or. 269, 68 Pac. 743, 1108.)

While a bailor might waive the tort and sue for the value of his grain in case of conversion, he is not required to do so, but may take any one of numerous courses open to him, and,

consequently, he does not become a "creditor" of the warehouseman unless he chooses to do so. This being so, owing to the number of bailors usually involved, and, perhaps, the manner in which warehouses for grain have been conducted in the past, the state stepped in and, for their protection, created the grain standard and marketing division of the department of agriculture. It is authorized to exact a bond for the protection of the bailors and, on default, is given power to intervene, without the consent of and without consulting the bailors, to seize grain found in the warehouse as stored grain, and, on exhausting this, to demand payment from the bondsmen in so far as necessary for the payment of storage tickets, again without consulting the bailors.

It is worthy of note that, in so far as the complaint discloses, no ticket holder is objecting to the action of the department in his behalf.

Nowhere in the Act do I find authority for the statement made in the majority opinion that the power just noted marks the full authority of the department or that "the legislature never contemplated that there should arise a situation, as here * * * ." I do not know what was in the contemplation of the legislature, but I do know that it empowered the department to do "all things lawful and needful" for the protection of the bailors, and I believe that, had it intended that the department should have power only to apply stored wheat and the proceeds of the bond to the payment of storage tickets, it would have granted those powers in set terms, rather than employing the phraseology found in the Act.

When a situation as is here shown does arise—and we know that it does often—it is clearly "needful" that additional steps be taken for the protection of those favored under the law discussed, the only question remaining being as to whether or not what is done is likewise "lawful."

We must remember that the statute deals only with "warehousemen" and that an elevator man acts in a dual capacity,—as warehouseman only with reference to storage contracts, and that, in his business of grain buyer he is no more a ware-

houseman than is the banker who rents safety boxes and thereby becomes a warehouseman, such as to his business of receiving money on deposit. Consequently, dealing only with warehousemen, the position of depositor and creditor is entirely foreign to the Act and to this case.

With this thought in mind, it is clear that the provisions of the Act, as amended, respecting the holders of other evidences of wheat delivered to a warehouseman than storage tickets, can apply only to like evidences of wheat delivered for storage; the rule of *ejusdem generis* applies.

As clearly pointed out in the majority opinion, there could be no legal objection to the warehouseman making amends to one or more of the bailors whose property he has converted, by delivering to such ones personal property, and this regardless of whether he is indebted or not; his creditors could not deprive those he thus favors of the property, as was done here.

Perhaps, under the law of agency, as declared in the majority opinion, the state officials could not act as agents for those the state has attempted to protect, without their prior consent, but I do not believe that this rule of law precludes the department from protecting ticket holders as it has attempted here to do. The warehouseman, having wronged those who deposited their property with him for safekeeping, could, under the majority opinion, make amends to them direct in exactly the same manner in which it is here attempted to make amends; why, then, when the number of those wronged is too great to admit of personal restitution, should he be precluded from making such restitution through the agency provided by the state for handling just such a situation and empowered to do "all things lawful and needful" for the protection of this class of bailors?

I believe that, under the law, the desired result may be reached by the creation of a trust and the delivery of the property to the state agency for its discharge.

"Except as to a purpose foreign to the public policy of the state or within the meaning of a statutory prohibition, the policy of the law, to permit a man to make whatever disposition

of his property he sees fit, allows him to create an active trust for any purpose he deems wise and expedient.'' (39 Cyc. 37.) The public policy of this state, in this regard, is clear from the attempt of the legislature fully to protect the holders of warehouse receipts.

In this state a trust may be created for any purpose for which a contract may be made, except as otherwise provided by the chapters on uses and trusts and on transfers. (Sec. 7883, Rev. Codes 1921.)

An express trust, for the benefit of a third person, is created with the mutual consent of the trustor and trustee, without consulting the *cestui que trust* (sec. 7903, Id.) and the acts of the trustee bind the trust property to the same extent as the acts of an agent bind his principal. (Sec. 7914, Id.)

At common law and under statute in some states, a trust may be created for the purpose of paying the settlor's debts (38 Cyc. 38; *Thomas* v. *Lamb*, 11 Cal. App. 717, 106 Pac. 254; *McHardy* v. *McHardy*, 7 Fla. 301). The common law in this respect is not changed in this state, except it be by the provisions of our Code respecting assignments for the benefit of creditors. For the purpose here considered, there is nothing in our statutes to prevent the creation of such a trust; it would not be an assignment for the benefit of creditors, for the holders of receipts are not creditors.

No particular words are necessary for the creation of a trust; the trust agreement need not be in writing and, the personal property having been delivered, the contract does not come within the statute of frauds. (Secs. 10612, 10613, Rev. Codes 1921; *Stagg* v. *Stagg*, 90 Mont. 180, 300 Pac. 539.)

The department acted under the statute in intervening and, according to the allegations of the complaint, with the consent and express authorization of the Grain Company. The facts alleged clearly show that the acts of the department were needful for the protection of ticket holders, and, in my opinion, they were lawful as well.

It is immaterial that the Grain Company may not have had a clear intention of creating a trust, or that the complaint

is not framed on the theory of a trust created. Under the rule which has always prevailed in this court, the sufficiency of the complaint should be upheld if it can be on any logical theory.

In my opinion, the ruling of the trial court should be reversed and the parties given the opportunity to determine their rights on a trial.

MR. JUSTICE FORD: I concur with what is said by MR. JUSTICE MATTHEWS above.

Rehearing denied December 11, 1931.